**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAKIMAH R. DYE,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: |
| | ) | |
| v. | ) | JUDGE: |
| | ) | |
| **CITY OF CLEVELAND,** | ) | |
| 601 Lakeside Avenue E. | ) | **COMPLAINT FOR DEPRIVATION OF** |
| Cleveland, OH 44114 | ) | **CIVIL RIGHTS (42 U.S.C. § 1983)** |
| | ) | |
| **MATTHEW COLE** | ) | JURY TRIAL DEMANDED |
| (in his individual capacity), | ) | |
| 5208 Wood Avenue | ) | |
| Cleveland, OH 44134 | ) | |
| | ) | |
| **DORNAT DRUMMOND** | ) | |
| (in his individual capacity), | ) | |
| 280 Buckeye Drive, #5 | ) | |
| Sheffield Lake, OH 44054 | ) | |
| | ) | |
| **MARK GRIFFIN** | ) | |
| (in his individual capacity), | ) | |
| 175 Honey Bell Oval #S | ) | |
| Chagrin Falls, OH 44022 | ) | |
| | ) | |
| **NICOLE CARLTON** | ) | |
| (in her individual capacity), | ) | |
| 50 Public Square #1437 | ) | |
| Cleveland, OH 44113 | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **JOHN DOES 1–5**, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES Plaintiff, Jakimah R. Dye, by and through counsel, and files this action to redress the deliberate fabrication of evidence, deprivation of due process, and destruction of her career and reputation by senior officials of the City of Cleveland, and states as follows:

## I. INTRODUCTION

1. This action arises from a deliberate and coordinated effort by senior officials and managerial personnel of the City of Cleveland, including Public Safety, Human Resources, Civil Service, and Law Department leadership, to knowingly fabricate and advance a false narrative of dishonesty against Plaintiff in order to justify her termination, defeat her appeal rights, and permanently foreclose her reinstatement.

2. Plaintiff Jakimah R. Dye devoted more than thirteen years of continuous service to the City of Cleveland, attained a senior classified civil service position with statutory protections against arbitrary termination, and maintained an unblemished disciplinary and performance record prior to the events at issue.

3. Following a motor vehicle accident, Defendants constructed, adopted, and relied upon a demonstrably false timeline claiming that Plaintiff only disclosed the presence of minors in her vehicle after being confronted with a police report that did not yet exist and could not have existed at the time of her disclosure.

4. This fabricated narrative was material and outcome-determinative. It was knowingly introduced through sworn testimony, embedded in internal Human Resources and Public Safety disciplinary processes, adopted in the written termination decision, and repeatedly advanced in formal administrative proceedings to support a charge of dishonesty that was factually false.

5. Defendants' actions were not negligent, mistaken, or the result of discretionary judgment. They were intentional acts undertaken with actual knowledge of the true sequence of events, or with deliberate indifference to readily available evidence establishing that the asserted timeline was false.

6. Through the coordinated actions of supervisory officials, Human Resources personnel, and legal decision-makers, Defendants corrupted the disciplinary and adjudicatory process by substituting a predetermined outcome for a fair evaluation of facts, thereby depriving Plaintiff of constitutionally required procedural safeguards.

7. As a direct and proximate result of Defendants' fabrication of evidence and corruption of the adjudicatory process, Plaintiff was deprived of her constitutionally protected property

2

interest in continued public employment, her liberty interest in her good name, reputation, and future employment opportunities, and her right to a fair and impartial adjudicatory process, in violation of the Fourteenth Amendment to the United States Constitution.

8. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to redress the misuse of governmental authority, the knowing presentation and ratification of false material evidence, and the resulting destruction of her career, reputation, and livelihood.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff's claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

10. This Court has supplemental jurisdiction over Plaintiff's state law claim for intentional infliction of emotional distress pursuant to 28 U.S.C. § 1367, as that claim forms part of the same case or controversy as Plaintiff's federal claims.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in the State of Ohio and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the Northern District of Ohio.

12. Defendants are subject to personal jurisdiction in this District because they reside in, conduct business in, and committed the acts and omissions complained of within the State of Ohio.

## III. PARTIES

13. Plaintiff JAKIMAH R. DYE ("Plaintiff") is an adult resident of the State of Ohio. Plaintiff served as a classified civil service employee of the City of Cleveland for more than thirteen (13) years of continuous service and earned approximately $124,000 annually at the time of her termination.

14. Defendant CITY OF CLEVELAND ("City") is a municipal corporation organized and existing under the laws of the State of Ohio and is responsible for the acts, policies, practices, customs, and decisions of its officials, employees, and agents acting under color of state law and within the scope of their employment and authority.

15. Defendant MATTHEW COLE ("Cole") was, at all relevant times, the Director of Human Resources for the City of Cleveland. Defendant Cole personally participated in the

3

investigation and disciplinary process concerning Plaintiff, provided sworn testimony regarding Plaintiff's alleged dishonesty, and advanced and maintained the fabricated factual narrative used to justify Plaintiff's termination and denial of reinstatement. Defendant Cole is sued in his individual capacity.

16. Defendant DORNAT DRUMMOND ("Drummond") was, at all relevant times, the Safety Director for the City of Cleveland and a final policymaker with authority over employee discipline and termination. Defendant Drummond approved, adopted, and executed Plaintiff's termination and ratified the false factual narrative regarding Plaintiff's conduct despite notice of facts contradicting that narrative. Defendant Drummond is sued in his individual capacity.

17. Defendant MARK GRIFFIN ("Griffin") was, at all relevant times, the Law Director for the City of Cleveland and the City's chief legal officer responsible for legal strategy, litigation posture, and representation in administrative proceedings. Defendant Griffin participated in the February 21, 2024, interview of Plaintiff, supervised and authorized the City's advocacy in disciplinary and appellate proceedings, and approved or ratified the continued use of fabricated evidence to justify Plaintiff's termination and denial of reinstatement. Defendant Griffin is sued in his individual capacity.

18. Defendant NICOLE CARLTON ("Carlton") was, at all relevant times, a senior Public Safety official for the City of Cleveland involved in the processing, review, and implementation of employee discipline. Defendant Carlton personally participated in the disciplinary process culminating in Plaintiff's termination, exercised discretionary authority in approving and implementing the termination decision, and facilitated the advancement of the dishonesty charge within the City's employment and disciplinary systems. Defendant Carlton is sued in her individual capacity.

19. Defendants JOHN DOES 1–5 are individuals whose identities are presently unknown who knowingly participated in advancing, approving, or maintaining the fabricated narrative and predetermined disciplinary outcome described herein, including potentially outside legal counsel and/or City officials who knowingly participated in advancing or defending the false timeline concerning the existence of the police report and Plaintiff's alleged dishonesty. Plaintiff will amend this Complaint to substitute the true names of these Defendants when their identities are discovered.

20. At all relevant times, each Defendant acted under color of state law and within the scope of their authority as officers, employees, or agents of the City of Cleveland.

4

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Employment and Protected Property Interest

21. Plaintiff began her employment with the City in or about 2010.

22. Over more than thirteen (13) years of continuous service, Plaintiff advanced into a senior professional and managerial position and consistently performed her duties in a competent and satisfactory manner, without any prior findings of dishonesty or serious misconduct.

23. Plaintiff was employed in classified civil service status and, under Ohio law and applicable Civil Service Rules, could be disciplined or terminated only for just cause and only after constitutionally adequate notice and a meaningful opportunity to be heard.

24. Plaintiff's termination resulted in the loss of senior-level public employment, annual earnings of approximately $124,000, employment benefits, and pension contributions commensurate with her position.

25. Plaintiff reasonably relied on the continuation of her classified civil service employment and her professional reputation for her livelihood, career advancement, and future employment opportunities.

### B. The Vehicle Accident

26. On February 17, 2024, Plaintiff was involved in a routine motor vehicle accident while operating a City-owned vehicle in the course of her employment.

27. The accident resulted in no criminal charges against Plaintiff and no allegation that Plaintiff engaged in intentional, reckless, or unlawful conduct.

28. Plaintiff promptly and fully cooperated with all post-accident reporting requirements, inquiries, and internal procedures.

### C. The February 21, 2024 Meeting with City Officials

29. On February 21, 2024, Plaintiff was directed to attend a meeting with Defendants Cole and Griffin concerning the motor vehicle accident.

30. Plaintiff was not advised prior to the meeting that it was investigatory or disciplinary in nature, nor was she informed that it could result in disciplinary action, nor was she given a

5

meaningful opportunity to be heard prior to the initiation of disciplinary proceedings, as required for classified civil service employees before deprivation of a protected property interest. The failure to provide these pre-disciplinary procedural protections denied Plaintiff the constitutionally adequate pre-termination process guaranteed to classified civil service employees under *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), and Ohio Revised Code Chapter 124.

31. During the meeting, Defendants Cole and Griffin asked Plaintiff to walk them through the events of February 17, 2024. Plaintiff answered the questions posed to her. When asked about the presence of children in the vehicle, Plaintiff acknowledged that children were present and identified two children in response to the question as posed. Plaintiff did not affirmatively state that only two children were present, and the question as posed did not require her to enumerate all occupants.

32. No contemporaneous notes, audio recording, or transcript of the February 21 meeting was created or preserved by Defendants Cole or Griffin. The only City account of what Plaintiff said at the meeting derives entirely from Defendant Cole's recollection, offered months later under examination, without any contemporaneous documentation.

33. At no point during the February 21 meeting was Plaintiff confronted with a police report, investigative findings, or any documentary evidence. No such report existed at that time.

34. At no point during the February 21 meeting was Plaintiff accused of dishonesty or informed that she was a subject of a disciplinary investigation.

### D. Plaintiff's Voluntary Clarification Email of February 22, 2024

35. In the early morning hours of February 22, 2024, at approximately 4:00 a.m., Plaintiff sent an unsolicited email to City officials, including Defendant Cole, voluntarily providing a detailed account of the February 17 accident, acknowledging that four children were present in the vehicle, and accepting responsibility for the improper use of a City vehicle.

36. Plaintiff sent the email without prompting, without being asked to do so, and without being confronted with any accusation, police report, investigative finding, or documentary evidence. No City official had asked Plaintiff for any follow-up or additional information prior to her sending the email.

37. Defendant Cole, after receiving Plaintiff's February 22 email, sent a follow-up email to Plaintiff requesting the specific identities of the four children listed in the email. This sequence, Plaintiff's unprompted disclosure followed by Cole's subsequent inquiry,

confirms that the February 22 email preceded, rather than responded to, any City demand for that information.

38. The February 22 email was an act of transparency and voluntary disclosure. Plaintiff had no obligation to send it and was not responding to any accusation of dishonesty.

### E. The Actual Timeline of the Warrensville Heights Police Report

39. At the time Plaintiff sent her clarification email at approximately 4:00 a.m. on February 22, 2024, no police report concerning the accident had been completed or released by the Warrensville Heights Police Department.

40. On the morning of February 21, 2024, the same day as Plaintiff's meeting with Cole and Griffin, a City representative contacted the Warrensville Heights Police Department requesting the accident report. At approximately 10:02 a.m., Marlene Ridenour of the Warrensville Heights Police Department forwarded that request to Officer Danny Calmease. At approximately 10:05 a.m., Officer Calmease responded: "This report is Not complete yet."

41. The Warrensville Heights Police Department completed and released the police report on or about February 23, 2024, one full day after Plaintiff had already sent her voluntary clarification email.

42. Accordingly, it was factually and chronologically impossible for Plaintiff's February 22 email to have been prompted by exposure to or knowledge of the police report's contents, as the report did not exist in completed form at the time of her disclosure.

43. Defendants knew, or were deliberately indifferent to the fact, that contemporaneous police department communications, report metadata, and the City's own records established this timeline and directly contradicted the dishonesty narrative subsequently asserted against Plaintiff.

### F. Plaintiff's Prior Disclosure to Her Supervisor at the Scene

44. On February 17, 2024, while still at the scene of the accident, Plaintiff contacted her direct supervisor, former Director of Public Safety Karrie Howard, and reported both the accident and the presence of children in the vehicle. Director Howard, who possessed authority to discipline employees for vehicle-related incidents, arrived at the scene and was personally present with the children.

45. Plaintiff's disclosure to Director Howard at the scene on February 17, days before the February 21 meeting with Cole and Griffin, demonstrates that Plaintiff made no effort to conceal the presence of children from City officials with supervisory authority. Defendant

7

Drummond acknowledged under examination that he was unaware whether Plaintiff had disclosed the presence of children to anyone on February 17, and that his conclusions about her dishonesty were based on secondhand review of documents rather than personal knowledge.

46. The City's dishonesty narrative suppressed and failed to account for Plaintiff's February 17 disclosure to Director Howard, despite the fact that Director Howard's own presence at the scene and subsequent communications with Cole and Griffin were known to Defendants throughout the disciplinary process.

### G. Predetermination, Fabrication, and Disregard of Applicable Rules

47. Prior to the completion of any meaningful investigation, Defendants discussed, treated, and acted upon discipline against Plaintiff as a foregone conclusion, thereby rendering subsequent investigative steps post-hoc justification rather than neutral fact-finding.

48. Beginning on or about February 22, 2024, Plaintiff was stripped of meaningful job duties, authority, and professional standing. Defendant Cole acknowledged under examination that the City cannot take disciplinary action, including reducing an employee's roles or responsibilities, before a pre-disciplinary hearing. This stripping of Plaintiff's authority therefore occurred in violation of the City's own rules and before any disciplinary finding had been made.

49. In furtherance of a predetermined outcome, Defendant Carlton, in her role as a senior Public Safety official, disregarded applicable Civil Service Rules and internal policies governing investigations, sequencing, neutrality, and timing, and proceeded with disciplinary action without a completed or verified investigative record.

50. To justify the predetermined termination, Defendants constructed, adopted, and advanced a false and misleading narrative asserting that Plaintiff's February 22 email was not a voluntary act of transparency, but rather a calculated response to anticipated or actual documentary exposure from the Warrensville Heights police report.

51. This narrative was materially false and pretextual. The police report did not exist in completed form at the time of Plaintiff's disclosure. Plaintiff had already disclosed the presence of children to her supervisor at the scene on February 17. And the sequence of communications, Plaintiff's unprompted 4:00 a.m. email followed by Cole's subsequent request for the children's identities, confirms the disclosure was not reactive to any City demand or documentary confrontation.

52. The dishonesty narrative was outcome-determinative. The charge of dishonesty, the sole substantive basis for Plaintiff's termination, could not stand without the false

characterization that Plaintiff became forthcoming only when she believed documentary proof was imminent.

### H. Defendant Cole's False Characterization and the Absence of Documentation

53. Defendant Cole testified under oath that after the February 21 meeting, he used the police report to determine the number and identities of the children in the vehicle — thereby confirming that he did not have that information from Plaintiff during the meeting and that the police report was a document he obtained after the meeting, not before.

54. Defendant Cole characterized Plaintiff's February 22 email as a "confession" and evidence of deception, adopting and advancing the narrative that her disclosure was reactive rather than voluntary. This characterization was false: Cole's own acknowledgment that he followed up after the email to ask for the children's identities confirms the email preceded his possession of that information.

55. Defendant Cole produced no contemporaneous notes, no audio recording, and no transcript of the February 21 meeting. His characterization of what Plaintiff said and how she said it rests entirely on his unverified, undocumented recollection, offered months after the fact.

56. Defendant Cole acknowledged under examination that he lacked personal knowledge of what Plaintiff disclosed at the scene on February 17, what she reported to City Superintendent Keith Larson, and what she reported to HR personnel Monique Tabb, each of whom she contacted from the scene. Despite this acknowledged lack of knowledge, Cole concluded Plaintiff was dishonest based on selective review of documents without accounting for the full record of her disclosures.

57. Defendant Carlton further relied upon disciplinary records, transcripts, and summaries that misrepresented the sequence of events surrounding Plaintiff's disclosure and the availability of the police report. As a senior Public Safety official with access to the disciplinary record and responsibility for the accuracy of termination decisions, Defendant Carlton knew or consciously disregarded a substantial risk that those materials were materially false or misleading, yet adopted and advanced them as the basis for Plaintiff's termination.

### I. The Termination Decision

58. Defendant Drummond, acting as Safety Director and final decisionmaker with authority over employee discipline and termination, issued a written disciplinary decision terminating Plaintiff's employment effective April 12, 2024.

59. The written termination decision expressly relied upon the conclusion that Plaintiff had made "untruthful, misleading, and/or deceptive statements" concerning the presence of minors in the vehicle.

60. In issuing the termination decision, Defendant Drummond adopted and ratified the false characterization of Plaintiff's conduct without conducting an independent review of the objective timeline evidence, including the Warrensville Heights communications establishing that the police report was not complete until February 23, that directly contradicted the dishonesty narrative.

61. Defendant Drummond acknowledged under examination that his conclusions regarding Plaintiff's honesty were based on review of documents rather than personal knowledge, that he was not present at the February 21 meeting, and that he was unaware of the full scope of Plaintiff's disclosures at the scene on February 17.

62. Defendant Carlton, acting in her capacity as a senior Public Safety official, signed, issued, and implemented Plaintiff's termination letter and formally advanced the dishonesty charge. In doing so, Carlton exercised discretionary authority and approved the termination without requiring verification of the factual accuracy of the narrative underlying the charge. Carlton's approval and implementation was a proximate and moving cause of Plaintiff's loss of employment and reputational injury.

## J. The City's Closing Argument and Continued Use of the False Narrative

63. Plaintiff timely appealed her termination to the Cleveland Civil Service Commission.

64. A neutral referee conducted evidentiary hearings and issued a written recommendation that Plaintiff be reinstated to her position. The referee's recommendation reflected a fair assessment of the evidence, including the absence of any contemporaneous documentation from the February 21 meeting and the objective evidence undermining the dishonesty narrative.

65. The matter was subsequently reopened for additional evidence, after which the referee reaffirmed his recommendation that Plaintiff be reinstated.

66. During oral argument before the Civil Service Commission, City counsel advanced the express claim that the Warrensville Heights crash report "came out" the same day as the February 21, 2024 meeting with Cole and Griffin — and that Plaintiff had "no place to hide" once the report confirmed four children were in the vehicle, causing her to send what the City called a "confession email" the following day.

10

67. This assertion was demonstrably false. City records and Warrensville Heights Police Department communications, available to Defendants throughout the proceedings, established that the report was not complete as of the morning of February 21, 2024, and was not released until February 23, 2024.

68. Plaintiff, through counsel, advised the Commission that the City's assertion was contradicted by documentary evidence establishing that the police report did not exist at the time of Plaintiff's disclosure. Despite this, Defendants continued to advance and defend the false timeline.

69. The Cleveland Civil Service Commission accepted the City's false narrative and denied Plaintiff's reinstatement, thereby ratifying Defendants' unconstitutional conduct and causing the continued deprivation of Plaintiff's protected property and liberty interests.

### K. Damages to Plaintiff

70. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff lost her employment with the City of Cleveland and her annual salary of approximately $124,000, along with employment benefits, pension contributions, and associated seniority.

71. Plaintiff has been unable to obtain comparable public or private employment due to the official finding of dishonesty entered against her and the public record of her termination.

72. Plaintiff's professional reputation has been severely and permanently damaged, impairing her credibility, employability, and standing within her profession.

73. Plaintiff has suffered substantial emotional distress, including anxiety, depression, humiliation, loss of professional identity, and emotional pain associated with the destruction of a long-standing public service career.

74. Plaintiff continues to suffer financial instability, lost career trajectory, and diminished future earning capacity as a result of Defendants' actions.

75. Defendants' conduct was intentional, willful, and undertaken with reckless disregard for Plaintiff's clearly established constitutional rights, entitling Plaintiff to compensatory and punitive damages.

76. The Cleveland Civil Service Commission's denial of reinstatement does not preclude this action and has no preclusive effect under principles of issue or claim preclusion. The Commission's findings were themselves the product of the same constitutional violations alleged herein, they were premised on the fabricated evidence and false testimony that

11

Defendants knowingly introduced into those proceedings. A prior adjudication that was fundamentally corrupted by the constitutional violations now at issue cannot foreclose the federal claims arising from those same violations. See University of Tennessee v. Elliott, 478 U.S. 788 (1986); Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75 (1984). Because the integrity of the Commission's process was fatally compromised by Defendants' misconduct, its ruling is entitled to no preclusive effect in this proceeding.

## V. CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 – Procedural Due Process (Property Interest)
### (Against All Defendants)

77. Plaintiff re-alleges, and incorporates by reference, Paragraphs 1 through 76 of this Complaint as if fully set forth herein.

78. Plaintiff possessed a constitutionally protected property interest in her continued employment as a classified civil service employee of the City of Cleveland. As an Executive Commissioner employed in the classified civil service, Plaintiff could be disciplined or terminated only for just cause and only after constitutionally adequate notice and a meaningful opportunity to be heard, as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), and Ohio Revised Code Chapter 124. The City of Cleveland's own Civil Service Rules provide procedural protections that meet or exceed the constitutional floor established by Loudermill.

79. Defendants, acting under color of state law, deprived Plaintiff of that protected property interest through a multi-stage process that was constitutionally deficient at every level, pre-disciplinary, pre-termination, and post-termination.

**Pre-Disciplinary Deprivation**

80. On February 21, 2024, Defendants Cole and Griffin conducted an investigatory interview of Plaintiff that led directly to the initiation of formal disciplinary proceedings. Cleveland Codified Ordinance § 171.53(a) guarantees every City employee the right to counsel at any stage of a disciplinary proceeding, including informal and preliminary steps, investigations, and interrogations of any kind that may result in or lead to disciplinary charges. Plaintiff was not advised of her right to counsel before or during the February 21 meeting and was not afforded an opportunity to secure representation before being subjected to the questioning that formed the factual predicate for the dishonesty charge used to terminate her.

81. The denial of Plaintiff's right to counsel at the February 21 investigatory interview was not a ministerial oversight. Defendant Cole acknowledged under examination that notifying employees of their right to representation before investigatory interviews was standard City practice required by codified ordinance, and that employees were entitled to a reasonable continuance to obtain counsel. Plaintiff received none of these protections.

82. Beginning on or about February 22, 2024, and before any pre-disciplinary hearing had been held, Defendants stripped Plaintiff of her meaningful job duties, authority, and professional standing within the organization. Defendant Cole acknowledged under examination that the City cannot reduce an employee's roles or responsibilities before a pre-disciplinary hearing. This stripping of Plaintiff's authority was therefore an unauthorized pre-disciplinary deprivation that violated the City's own procedures and the constitutional protections those procedures are designed to enforce.

## Pre-Termination Deprivation

83. A pre-disciplinary conference was not held until March 27, 2024, more than five weeks after Plaintiff had already been effectively marginalized and her termination treated as a foregone conclusion. The pre-disciplinary conference that was ultimately held did not constitute a constitutionally adequate pre-termination hearing because it was premised entirely on the fabricated narrative that Plaintiff had been dishonest, a charge whose operative factual basis, the false characterization of her February 22 email as reactive rather than voluntary, was itself the product of knowingly false or recklessly advanced material assertions. A pre-termination hearing conducted on a fabricated factual predicate does not satisfy Loudermill's requirement of a meaningful opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. at 546.

84. Because the dishonesty charge rested on a demonstrably false factual premise, Plaintiff was denied a meaningful opportunity to respond to the actual basis for her termination. She could not effectively contest a charge whose operative foundation was misrepresented to her and to the decision-makers responsible for evaluating it.

## Post-Termination Deprivation

85. Plaintiff timely appealed her termination to the Cleveland Civil Service Commission. A neutral referee twice recommended reinstatement after full evidentiary proceedings. Despite those recommendations, the Commission denied reinstatement and affirmed the termination.

86. The post-termination process before the Civil Service Commission did not remedy the constitutional violations underlying the termination. The Commission's proceedings were themselves fatally compromised because Defendants continued to advance, defend, and rely upon the fabricated narrative, including the false claim that the Warrensville Heights

13

police report was available on February 21, 2024, in their advocacy before the Commission, even after Plaintiff presented documentary proof that the report was not complete until February 23, 2024.

87. A post-termination process that accepts and credits knowingly false material evidence as the factual basis for its decision is not a constitutionally adequate post-deprivation remedy under *Mathews v. Eldridge, 424 U.S. 319* (1976). The constitutional sufficiency of post-termination process depends on whether it provides a meaningful check on the deprivation. Where the post-termination body is presented with fabricated evidence and credits it over documentary proof of its falsity, the process provides no meaningful check and cannot satisfy the constitutional requirement.

88. Defendants' conduct in advancing and maintaining the fabricated narrative throughout the post-termination proceedings prevented Plaintiff from receiving the constitutionally adequate post-deprivation process to which she was entitled.

**Clearly Established Law**

89. At the time of Defendants' actions, it was clearly established under the Fourteenth Amendment and Loudermill that a classified public employee possesses a protected property interest in continued employment and may not be deprived of that interest without constitutionally adequate process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). It was equally clearly established that the knowing use of fabricated or materially false evidence in a disciplinary proceeding corrupts the integrity of that process and renders it constitutionally deficient. *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999); *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006). No reasonable government official could have believed that conducting an investigatory interview without advising a classified civil service employee of her right to counsel, stripping her of job duties before any pre-disciplinary hearing, and then advancing knowingly false material evidence through every stage of the disciplinary and appellate process, was consistent with the constitutional protections guaranteed to a classified public employee.

**Causation and Damages**

90. As a direct and proximate result of Defendants' deprivation of Plaintiff's procedural due process rights, Plaintiff lost her classified civil service position, her annual salary of approximately $124,000, her employment benefits, her pension contributions, and her professional standing. Plaintiff has been unable to obtain comparable employment due to the official finding of dishonesty embedded in the public record of her termination, and has suffered substantial economic losses, reputational harm, emotional distress, and other non-economic damages.

14

## COUNT II
### 42 U.S.C. § 1983 – Fabrication of Evidence
### (Against All Defendants)

91. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 90 of this Complaint as if fully set forth herein.

**The Constitutional Right**

92. The Fourteenth Amendment's Due Process Clause prohibits government officials from knowingly fabricating material evidence, making materially false statements of fact, or deliberately advancing a false factual narrative in a disciplinary or adjudicatory proceeding in order to cause the deprivation of an individual's constitutionally protected liberty or property interests. This prohibition applies with equal force in the civil and administrative employment context as it does in the criminal context. *Stemler v. City of Florence*, 126 F.3d 856, 872–73 (6th Cir. 1997); *Claybrook v. Birchwell*, 199 F.3d 350, 359–60 (6th Cir. 2000). Where government officials knowingly introduce false material evidence into a disciplinary process and that evidence is outcome-determinative, the process is constitutionally corrupted and any resulting deprivation violates due process regardless of the procedural form in which it occurs.

93. Separately and independently, the Due Process Clause prohibits government conduct that shocks the conscience, including the deliberate fabrication and sustained prosecution of a knowingly false material charge against a public employee, continued even after documentary proof of its falsity was presented to the decision-makers, for the purpose of permanently destroying that employee's career, reputation, and constitutional rights. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Braley v. City of Pontiac*, 906 F.2d 220, 226 (6th Cir. 1990).

**The Fabricated Narrative**

94. Defendants, acting under color of state law and in concert with one another, knowingly constructed, adopted, and advanced a materially false factual narrative asserting that Plaintiff's February 22, 2024 clarification email was not a voluntary act of transparency but rather a calculated response to documentary exposure, specifically, that the Warrensville Heights Police Department's accident report had been released, confronting Plaintiff with proof that four children were in the vehicle, and causing her to disclose what she had previously concealed.

95. This narrative was objectively and demonstrably false, and Defendants knew it or acted with deliberate indifference to its falsity. The objective documentary record establishes the following sequence with precision:

a. On February 21, 2024, at 10:05 a.m., Warrensville Heights Police Department Officer Danny Calmease responded to a City representative's request for the accident report with the written confirmation: "This report is Not complete yet."

b. Plaintiff sent her voluntary clarification email to Defendant Cole and others at approximately 4:00 a.m. on February 22, 2024, hours after the February 21 meeting with Cole and Griffin, and before any police report had been completed or released.

c. On February 22, 2024, at 7:23 a.m., a media representative followed up with the Warrensville Heights Police Department on a records request, confirming the report had not yet been provided.

d. On February 23, 2024, at 3:35 p.m., Warrensville Heights Chief of Police Wesley F. Haynes notified the requesters that all public records items, including the accident report, were ready for pickup.

e. Defendant Cole testified under oath that he used the police report to determine the names of the four children in the vehicle. Given that the report was not available until February 23, Cole could not have possessed it before Plaintiff sent her February 22 email, confirming that his own testimony destroys the fabricated timeline.

96. The fabricated narrative was not a matter of honest mistake, disputed interpretation, or different memory. The Warrensville Heights Police Department's own communications, timestamped and preserved in the record, establish with objective certainty that the report did not exist in completed form at the time Plaintiff sent her email. Defendants had access to these communications. Their sustained advancement of the contrary narrative was therefore knowing, or at minimum reflected deliberate indifference to readily available evidence that exposed the falsity of their position.

**Materiality and Outcome-Determinative Effect**

97. The fabricated narrative was material and outcome-determinative at every stage of the disciplinary process. The charge of dishonesty, the sole substantive basis for Plaintiff's termination, could not survive without the false characterization that Plaintiff became truthful only when she believed documentary proof was imminent. Absent that characterization, Plaintiff's February 22 email was exactly what it appeared to be: a voluntary, unprompted act of transparency sent hours after a meeting in which she had been asked about the accident and before any City demand for follow-up or any documentary confrontation.

98. Defendant Cole himself confirmed the voluntary nature of the email when he responded to it in writing with the statement that the City "truly appreciate[d] your follow-up and honesty." That contemporaneous acknowledgment, which Cole later attempted to recharacterize as contextually inappropriate, reflects the only reasonable interpretation of

16

the email at the time it was received: that Plaintiff had been forthcoming. The dishonesty narrative that followed was constructed after the fact to serve a predetermined outcome.

99. The fabricated narrative was introduced, repeated, and enforced through each of the following acts:

a. Defendant Cole's characterization of the February 22 email as a "confession" prompted by anticipated documentary exposure, in sworn testimony before the neutral referee;

b. The written termination decision issued by Defendant Drummond, which expressly concluded Plaintiff made "untruthful, misleading, and/or deceptive statements" based on Cole's fabricated characterization of the sequence of events;

c. Defendant Carlton's signature, issuance, and implementation of the termination letter advancing the dishonesty charge, without independent verification of the factual accuracy of the underlying narrative;

d. Defendant Griffin's authorization and supervision of the City's advocacy in administrative proceedings, including the express oral argument before the Civil Service Commission asserting that the crash report "came out" on February 21 — a claim directly contradicted by the Warrensville Heights Police Department's own records; and

e. The continued defense of the fabricated timeline in Commission proceedings even after Plaintiff presented Exhibit UU, the documentary evidence establishing that the police report was not published until after her email and specifically drew the Commission's attention to this proof.

**Suppression of Exculpatory Evidence**

100. The fabrication was compounded by the City's failure to account for, and its active suppression of, evidence that negated the dishonesty charge entirely. Defendants knew, or were deliberately indifferent to the fact, that Plaintiff had disclosed the presence of children in the vehicle to her direct supervisor, Director Howard, at the scene on February 17, before any of the communications with Cole and Griffin. Defendant Cole acknowledged under cross-examination that he lacked personal knowledge of what Plaintiff disclosed at the scene on February 17, and that he made no effort to verify the full scope of her disclosures before concluding she was dishonest. The termination decision and the administrative advocacy that followed were built on an artificially narrowed factual record that excluded the most probative evidence of Plaintiff's transparency.

**Clearly Established Law and Qualified Immunity**

101. At the time of Defendants' conduct beginning in February 2024 and continuing through the Civil Service Commission proceedings in 2025, it was clearly established in the Sixth

17

Circuit that a government official may not knowingly use fabricated or materially false evidence in a disciplinary proceeding to cause the deprivation of a public employee's protected liberty or property interests. *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997); *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000); Gregory v. City of Louisville, 444 F.3d 725 (6th Cir. 2006). It was equally clearly established that government conduct meeting the conscience-shocking standard violates substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

102. No reasonable government official could have believed that knowingly advancing a factual narrative contradicted by timestamped documentary evidence and continuing to advance that narrative in administrative proceedings after being confronted with documentary proof of its falsity, was consistent with the constitutional rights of a classified civil service employee with a clearly established protected property and liberty interest in her employment and reputation.

## Causation and Damages

**103.** As a direct and proximate result of Defendants' knowing fabrication and use of false material evidence, Plaintiff was deprived of her constitutionally protected property interest in continued public employment and her liberty interest in her reputation and future employment opportunities. Plaintiff suffered the loss of her position, her annual salary of approximately $124,000, her employment benefits, her pension contributions, and her professional standing. She has been unable to obtain comparable employment due to the publicly embedded finding of dishonesty, and has suffered substantial economic loss, reputational injury, emotional distress, and other compensable damages.

**COUNT III**
**42 U.S.C. § 1983 – Deprivation of Liberty Interest (Stigma-Plus)**
**(Against All Defendants)**

104. Plaintiff re-alleges, and incorporates by reference, Paragraphs 1 through 103 of this Complaint as if fully set forth herein.

## The Protected Liberty Interest

105. The Fourteenth Amendment's Due Process Clause protects a public employee's liberty interest in her good name, reputation, honor, integrity, and future employment opportunities. Where a government employer publicly disseminates false and stigmatizing charges in connection with the termination of a public employee and fails to provide a constitutionally adequate name-clearing hearing, the employee is deprived of this liberty interest without due process of law. *Paul v. Davis*, 424 U.S. 693 (1976); *Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002); *Chilingirian v. Boris,* 882 F.2d 200, 205 (6th Cir. 1989).

**The Stigmatizing False Statements**

106. In connection with Plaintiff's termination, Defendants publicly branded Plaintiff as dishonest, deceptive, and lacking candor through multiple formal channels, each of which placed a stigmatizing false charge in the public record:

a. Defendant Cole testified under oath before a neutral referee and in administrative proceedings that Plaintiff's voluntary February 22 email was a "confession" prompted by anticipated documentary exposure, a characterization that was knowingly false and that attributed to Plaintiff the intent to deceive, which she did not possess.

b. Defendant Drummond's written termination decision expressly concluded that Plaintiff made "untruthful, misleading, and/or deceptive statements," a formal finding of dishonesty against a senior public official that is part of the permanent public record of her employment.

c. City counsel, acting under Defendant Griffin's supervision and authority, argued before the Civil Service Commission that Plaintiff "had no place to hide" once the police report confirmed four children were in the vehicle, and characterized her voluntary clarification email as a "confession," expressly framing her as a dishonest public official who only came forward when she could no longer conceal the truth.

d. The Cleveland Civil Service Commission's written Findings of Fact and Conclusions of Law formally found Plaintiff "dishonest" and "lacking candor," a publicly accessible official adjudicatory finding that attached the label of dishonesty to a senior public safety official whose position, in the Commission's own language and in City counsel's argument, required "high confidence and trust, integrity, fidelity" and was described as "a step away from the Director position."

107. Each of these stigmatizing statements was false. As established in the Factual Allegations above, the documentary record, including timestamped communications from the Warrensville Heights Police Department, proves that no police report existed at the time Plaintiff sent her email, that her disclosure was voluntary and unprompted, and that she had disclosed the presence of children to her supervisor at the scene on February 17. The dishonesty charge could not survive honest application of those facts.

108. The elevation of Plaintiff's position, expressly argued by the City and adopted by the Commission as the basis for heightened scrutiny, amplifies rather than diminishes the reputational harm. A formal finding of dishonesty against a senior public safety official described as occupying a position of the highest trust is not a finding that stays within the City's walls. It permanently defines her professional identity in any future context in which that record is disclosed or discovered.

19

**Public Dissemination**

109. The stigmatizing charges were disseminated beyond the City's internal processes in the following respects: the Civil Service Commission's proceedings were conducted by public videoconference; the Commission's written Findings of Fact and Conclusions of Law constitute a formal public adjudicatory record; the termination letter is part of the publicly accessible administrative record of Plaintiff's employment; and the City's oral argument before the Commission was made in an open public proceeding.

110. As a direct result of the public dissemination of the false dishonesty finding, Plaintiff has been unable to obtain comparable public or private employment in her chosen field. The official finding of dishonesty against a senior public safety official is a career-ending designation in the municipal government and public administration labor market.

**The Absence of a Constitutionally Adequate Name-Clearing Hearing**

111. Plaintiff was not afforded a constitutionally adequate name-clearing hearing at any stage of the disciplinary or appellate process. A name-clearing hearing is constitutionally adequate only if it provides a genuine and meaningful opportunity for the employee to contest the false charge on its actual merits before a neutral decision-maker applying accurate facts. *Quinn v. Shirey*, 293 F.3d at 320.

112. The Civil Service Commission proceedings did not satisfy this standard for the following independent and cumulative reasons:

a. **The proceedings accepted and credited the fabricated narrative.** The Commission's written Findings expressly adopted the dishonesty charge based on the same false factual predicate, that Plaintiff failed to be forthright when asked, without engaging with or crediting the documentary proof Plaintiff introduced as Exhibit UU establishing that the police report did not exist at the time of her voluntary disclosure. A name-clearing hearing that accepts false evidence as established fact and ignores documentary proof of its falsity does not provide a meaningful opportunity to clear one's name. It reaffirms the stigma under the appearance of process.

b. **The Commission overrode two recommendations of reinstatement from a neutral referee without engaging the documentary record.** The neutral referee who heard live testimony across four days of proceedings twice recommended reinstatement, findings that reflected a fair assessment of the evidence. The Commission overrode both recommendations without hearing live testimony and without addressing the documentary evidence undermining the dishonesty charge. A reviewing body that substitutes its own credibility conclusions for those of the neutral factfinder without engaging the underlying evidence does not provide the meaningful review that a name-clearing hearing requires.

20

c. **The Commission's own procedural rules were violated in ways that compromised the fairness of the proceedings.** Plaintiff's counsel identified before the Commission that the City violated Civil Service Rule 9.23 by belatedly adding the dishonesty charge on February 28 after the initial pre-disciplinary notice contained no mention of dishonesty. Plaintiff's counsel further identified that the City did not provide all exhibits to Plaintiff prior to the pre-disciplinary hearing, instead introducing them into the record after the fact. These procedural violations, which the Commission did not address, further undermined the adequacy of the process as a name-clearing mechanism.

d. **The oral argument before the Commission was limited to fifteen minutes per side** under Commission Rule 9.70, after which the Commission voted to deny reinstatement without further inquiry into the documentary evidence contradicting the City's narrative. The compression of a multi-year, multi-day evidentiary proceeding into fifteen minutes of oral argument before a body that then voted unanimously to deny reinstatement, crediting the City's false narrative over two referee recommendations and documentary proof, does not constitute the meaningful opportunity to be heard that due process requires.

113. Plaintiff was therefore denied both a pre-termination and post-termination name-clearing opportunity that was constitutionally adequate. The pre-termination process offered no opportunity to contest the dishonesty charge before it was formalized. The post-termination process before the Commission accepted the false charge as established and provided no meaningful mechanism through which Plaintiff could have her name cleared on the actual merits.

**Clearly Established Law**

114. At the time of Defendants' actions, it was clearly established that a public employee has a protected liberty interest in her reputation that is implicated when a government employer publicly disseminates false stigmatizing charges in connection with termination, and that the employee is entitled to a name-clearing hearing that provides a genuine opportunity to contest those charges. *Paul v. Davis*, 424 U.S. 693 (1976); *Quinn v. Shirey*, 293 F.3d 315 (6th Cir. 2002). It was equally clearly established that a name-clearing hearing conducted on a fabricated factual predicate, one that accepts false material evidence over documentary proof of its falsity, does not satisfy constitutional requirements. No reasonable government official could have believed that publicly branding a classified civil service employee as dishonest in formal adjudicatory proceedings, based on a timeline they knew or should have known was contradicted by objective documentary evidence, was consistent with that employee's clearly established liberty interest in her reputation.

**Causation and Damages**

115. As a direct and proximate result of Defendants' deprivation of Plaintiff's liberty interest, Plaintiff has been foreclosed from obtaining comparable employment in public administration or municipal government. The official dishonesty finding, embedded in a publicly accessible Commission ruling, a formal termination letter, and sworn administrative testimony, follows Plaintiff into every future employment context in which her history is disclosed or discovered. Plaintiff has suffered permanent reputational harm, loss of future earning capacity, emotional distress, humiliation, and the destruction of a professional identity built over thirteen years of unblemished public service.

## COUNT IV

### 42 U.S.C. § 1983 – Civil Conspiracy
### (Against Defendants Cole, Drummond, Griffin, Carlton, and John Does 1–5)

116. Plaintiff realleges and incorporates by reference Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

**The Legal Framework**

117. A civil conspiracy under 42 U.S.C. § 1983 consists of a agreement between two or more persons acting under color of state law to deprive a plaintiff of constitutional rights, combined with an overt act in furtherance of the conspiracy that causes injury. *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). The existence of a conspiracy may be inferred from circumstantial evidence, including the coordinated advancement of identical false assertions across multiple stages of a disciplinary process by defendants who each possessed independent knowledge of the facts. *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).

**Defeating the Intra=corporate Conspiracy Doctrine**

118. Defendants will likely assert the intra-corporate conspiracy doctrine, the principle that employees of the same governmental entity cannot conspire with one another because their acts are legally the acts of a single entity. That doctrine does not apply here for two independent and cumulative reasons.

119. First, the intra-corporate conspiracy doctrine does not apply where each defendant was acting outside the scope of their lawful governmental authority. No government official is authorized to knowingly fabricate material evidence, advance a false factual narrative through sworn testimony and formal proceedings, or continue to prosecute a demonstrably false charge after being confronted with documentary proof of its falsity. These are not acts within the scope of legitimate governmental function, they are abuses of governmental

22

authority that no official position authorizes. Because Defendants' conspiratorial conduct exceeded the bounds of any legitimate governmental function, their acts cannot be characterized as the unified acts of a single entity. *Johnson v. Hills & Dales General Hospital*, 40 F.3d 837, 840–41 (6th Cir. 1994); *Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019).

120. Second, and independently, the intra-corporate conspiracy doctrine does not apply where each defendant acted with a personal stake in the outcome that distinguished their individual interests from the institutional interests of the City. *Doherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984). Each defendant here had a distinct personal stake in advancing and maintaining the fabricated narrative that went beyond any legitimate institutional interest:

a. Defendant Cole had a personal stake in insulating his own characterization of the February 21 meeting and the February 22 email from scrutiny. He produced no contemporaneous notes and his account of what Plaintiff said rested entirely on his unverified recollection. Exposure of the fabricated timeline would expose his own role in constructing and advancing it through sworn testimony.

b. Defendant Griffin had a personal stake in protecting both his own professional exposure as the attorney who participated in the February 21 meeting and who supervised the false narrative through administrative proceedings, and in preserving the City's litigation posture in a matter his office had already committed to defending.

c. Defendant Drummond had a personal stake in protecting the termination decision he personally signed and in insulating himself from accountability, particularly given that he was himself involved in a preventable vehicle accident he failed to report to his supervisor, conduct substantively identical to what he characterized as terminable dishonesty in Plaintiff's case, for which he received only a letter of reinstruction.

d. Defendant Carlton had a personal stake in preserving the disciplinary outcome she personally signed, issued, and implemented, and in avoiding the professional and institutional consequences of having executed a termination decision built on a false factual foundation.

## The Agreement and Coordinated Acts

121. Beginning on or about February 21, 2024, Defendants Cole, Griffin, Drummond, Carlton, and John Does 1–5 reached a mutual understanding and agreement to advance and maintain a false narrative asserting that Plaintiff's February 22 email was a reactive confession prompted by anticipated documentary exposure rather than a voluntary act of transparency.

23

122. The existence of this agreement is established by inference from the following pattern of coordinated conduct that cannot reasonably be explained by coincidence or independent judgment:

a. Cole and Griffin jointly conducted the February 21 investigatory interview without advising Plaintiff of her right to counsel, without producing any contemporaneous record of what was said, and without disclosing its disciplinary purpose, establishing the unrecorded factual foundation on which the false narrative would later rest.

b. Cole characterized the February 22 email as a "confession" in sworn testimony despite having contemporaneously responded to it by thanking Plaintiff for her "follow-up and honesty," a characterization that required a deliberate post-hoc reframing inconsistent with his own initial response.

c. Drummond issued a written termination decision expressly adopting Cole's fabricated characterization of the sequence of events, without conducting any independent review of the objective documentary evidence establishing that no police report existed at the time of Plaintiff's disclosure, evidence that was available to him and that he acknowledged he had not personally verified.

d. Carlton signed, issued, and implemented the termination letter advancing the dishonesty charge, exercising discretionary authority to formalize a termination she knew or should have known rested on an unverified and disputed factual foundation.

e. Griffin authorized and supervised the City's advocacy in administrative proceedings, including the express oral argument before the Civil Service Commission asserting that the crash report "came out" on February 21, a claim directly contradicted by the Warrensville Heights Police Department's own timestamped records, which were available to the City throughout the proceedings.

f. Each Defendant continued to advance and defend the fabricated timeline after Plaintiff presented Exhibit UU to the Commission, documentary proof that the police report was not available until February 23, 2024, demonstrating that the continued advocacy was not the product of honest mistake but of deliberate choice.

123. The identical nature of the false narrative advanced by each defendant across every stage of the process, from the February 21 meeting, through the pre-disciplinary conference, through the written termination decision, through sworn testimony before the referee, and through oral argument before the Commission, is circumstantial evidence of a prior

agreement. Independent actors exercising independent judgment would not uniformly advance the same demonstrably false assertion across a year-long multi-stage proceeding. The uniformity of the false narrative is itself evidence of coordination.

## Overt Acts in Furtherance

124. In furtherance of the conspiracy, and pursuant to their agreement, Defendants committed the following overt acts:

a. Conducting an investigatory interview of Plaintiff without counsel notification, without contemporaneous documentation, and without disclosing its disciplinary character, thereby creating an unrecorded factual foundation susceptible to post-hoc manipulation;

b. Drafting, approving, and issuing a pre-disciplinary notice on February 28 containing a dishonesty charge added seven days after the initial notice contained no such charge, in violation of Civil Service Rule 9.23;

c. Issuing a written termination decision expressly premised on the fabricated characterization of Plaintiff's February 22 email;

d. Providing sworn testimony before the neutral referee characterizing the February 22 email as a "confession" prompted by documentary exposure;

e. Authorizing and advancing oral argument before the Civil Service Commission asserting the police report was available on February 21, 2024, a claim the City's own records refuted; and

f. Continuing to defend the fabricated timeline in Commission proceedings after Plaintiff presented documentary proof of its falsity, thereby ensuring the false narrative would be embedded in a publicly accessible official adjudicatory record.

## Causation and Damages

125. Plaintiff suffered constitutional injury and damages as a direct and proximate result of Defendants' conspiratorial acts, including the loss of her classified civil service employment, her annual salary of approximately $124,000, her employment benefits, her pension contributions, her professional reputation, and her future employment opportunities.

25

126. Defendants' actions were intentional, willful, and undertaken with reckless disregard for Plaintiff's clearly established constitutional rights, entitling Plaintiff to compensatory and punitive damages against each individual defendant.

## COUNT V

### Monell Liability – Policy, Practice, and Ratification
### (Against Defendant City of Cleveland)

127. Plaintiff realleges and incorporates by reference Paragraphs 1 through 126 of this Complaint as if fully set forth herein.

**The Legal Framework**

128. A municipality is liable under 42 U.S.C. § 1983 when an official municipal policy, an established custom or practice, or ratification by a final policymaker is the moving force behind a constitutional deprivation. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). Municipal liability may be established through any one of three independent theories: an unconstitutional official policy expressly adopted by the municipality; an unconstitutional custom or practice so persistent and widespread as to constitute a de facto policy; or ratification of an unconstitutional act by a municipal official with final policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Plaintiff alleges all three theories, each independently sufficient.

**Theory One — Ratification by a Final Policymaker**

129. Defendant Drummond, as Safety Director for the City of Cleveland, possessed final policymaking authority over employee discipline and termination within the Department of Public Safety under the City Charter. Drummond testified under oath that as Safety Director he held "final authority on discipline" and that the authority to terminate, demote, or suspend beyond ten days was "vested in them through the charter." Cleveland Charter § 79 confirms that department directors have supervision and control over officers and employees in their division. The Civil Service Commission's own Findings of Fact confirmed that the departmental director holds final disciplinary authority over classified employees. Drummond is a final policymaker for purposes of municipal liability.

130. Drummond personally reviewed, approved, and issued the written termination decision on April 12, 2024, expressly adopting the fabricated dishonesty narrative as the sole substantive basis for termination. He thereafter issued a second written decision on December 2, 2024, affirming termination after the neutral referee had twice recommended reinstatement, doing so with full knowledge that the factual basis for the

dishonesty charge was disputed and with documentary evidence in the record contradicting it.

131. A final policymaker's deliberate choice to adopt and reaffirm an unconstitutional act, made with knowledge of facts establishing its constitutional infirmity, constitutes ratification of that act as official municipal policy. *Praprotnik*, 485 U.S. at 127. Drummond's two independent decisions, each made with notice of the documentary evidence undermining the dishonesty charge, constitute ratification of the fabricated narrative and the constitutional violations flowing from it as the official policy of the City of Cleveland.

132. The City is therefore liable for the constitutional violations arising from Drummond's ratification of the fabricated narrative as the basis for Plaintiff's termination and the denial of her reinstatement.

**Theory Two — Custom and Practice of Selective and Pretextual Disciplinary Application**

133. Independently of ratification, the City of Cleveland maintained an established custom and practice of selectively applying dishonesty charges as a mechanism to justify termination decisions that could not be sustained under the City's own written progressive discipline policy, using fabricated or overstated dishonesty findings to bypass the procedural protections that would otherwise govern first-offense policy violations. This custom was the moving force behind the deprivation of Plaintiff's constitutional rights.

134. The existence of this custom is established by the following specific facts drawn from the record of the administrative proceedings:

a. The City's own Motor Vehicle Accident Policy expressly prescribed a written reprimand as the appropriate sanction for a first-offense preventable accident. Plaintiff's accident was classified as a first-offense preventable accident, designated with the letter A under the Motor Vehicle Accident Review Committee's findings. The policy's mandatory disciplinary schedule was bypassed entirely in her case and replaced with termination, not because of the accident itself, which Drummond acknowledged was not grounds for termination, but because of the dishonesty charge constructed on the fabricated narrative.

b. Former Director of Public Safety Howard, who had disciplined hundreds of employees over his tenure, testified that he had never known the City to skip every step of progressive discipline and proceed straight to termination. The departure from established progressive discipline in Plaintiff's case was not authorized by any written policy, it was a product of the fabricated dishonesty charge that manufactured grounds for termination where none legitimately existed.

27

c. The record identifies multiple named City employees who engaged in conduct substantively identical or more serious than what was charged against Plaintiff, without termination: Lieutenant Robert DiSanto, who lied about the circumstances of a vehicle accident, received a letter of reinstruction or written reprimand; Patrol Officer Delvante Scott, who lied about circumstances of a car crash, was not terminated; Officer John Cho, who was in an accident with a child in the vehicle, was not terminated; and Defendant Drummond himself, who was involved in a preventable vehicle accident he failed to report to his direct supervisor, received only a letter of reinstruction. The Motor Vehicle Accident Policy's mandatory progressive discipline schedule was applied to each of these comparators but not to Plaintiff.

d. A member of the Civil Service Commission herself observed during oral argument that across the documentary record there was "a pattern and it's not consistent" in the treatment of employees, an observation made in the context of reviewing the same disciplinary evidence presented here. That observation, made by a member of the body that ultimately ratified the termination, acknowledges the pattern of inconsistent application on the face of the Commission's own proceedings.

135. This custom, using dishonesty findings as a pretext to bypass progressive discipline protections and achieve termination outcomes that written policy does not authorize, was the moving force behind the deprivation of Plaintiff's constitutional rights. Without the fabricated dishonesty charge, Plaintiff's first-offense preventable accident would have been addressed through the written reprimand the Motor Vehicle Accident Policy required. The dishonesty charge was the mechanism by which the custom operated to justify a departure from written policy.

136. Discovery will establish additional instances in which the City's disciplinary apparatus reached predetermined termination outcomes through post-hoc dishonesty characterizations of employee conduct that did not independently meet the written grounds for termination, consistent with the pattern identified in the record of this proceeding.

**Theory Three — Inadequate Policy Governing Fabrication of Disciplinary Evidence**

137. The City also maintained a policy, practice, or custom of accepting and relying upon investigative and disciplinary narratives constructed without contemporaneous documentation or verification against objective evidence, and of defending those narratives in administrative proceedings even after documentary proof of their falsity was presented. This practice was not an isolated failure, it was the disciplinary process as actually administered.

138. Specifically, the City permitted and ratified a disciplinary investigation that produced no contemporaneous notes, no audio record, and no transcript of its central investigatory

28

interview, relying instead on an unverified account offered months later. The City then built a termination decision on that unverified account, advanced it in sworn testimony and formal proceedings, and continued to defend it before the Civil Service Commission after documentary proof of its falsity was placed in the record. At no stage did any City official responsible for the disciplinary process require verification of the factual accuracy of the dishonesty narrative against the available documentary evidence. This absence of any verification requirement, as applied from the February 21 meeting through the Commission proceedings, constitutes a custom or practice of accepting post-hoc disciplinary justifications without meaningful factual verification.

139. This custom was the moving force behind the deprivation of Plaintiff's constitutional rights. A disciplinary process that requires verification of factual assertions against available documentary evidence before finalizing a termination decision would have prevented the fabricated narrative from surviving to the termination stage.

**Griffin's Role in Municipal Liability**

140. Defendant Griffin is not independently designated as a final policymaker over employee discipline. His Monell exposure arises through ratification: as Law Director, Griffin authorized, supervised, and directed the City's legal strategy in the disciplinary and appellate proceedings, including the oral argument before the Civil Service Commission expressly advancing the false timeline. His authorization of litigation strategy that knowingly advanced a false factual narrative, in the name of and on behalf of the City, contributed to and constituted participation in the City's ratification of the unconstitutional conduct. Griffin's authorization of the City's legal posture is municipal action, not merely individual conduct, because the City speaks through its Law Director in formal legal proceedings.

141. Each of the above theories, ratification by Drummond as final policymaker, the custom of selective and pretextual disciplinary application, and the practice of accepting unverified disciplinary narratives, was the moving force behind the deprivation of Plaintiff's constitutionally protected property interest, liberty interest, and right to a fair disciplinary process.

142. As a direct and proximate result of the City's unconstitutional policies, customs, and ratification, Plaintiff suffered the loss of her classified civil service position, her annual salary of approximately $124,000, her employment benefits, her pension contributions, her professional reputation, and her future employment opportunities, together with substantial emotional distress and other compensable damages.

29

## COUNT VI
## Intentional Infliction of Emotional Distress
### (Against Defendants Cole, Drummond, Griffin, and John Does 1-5)

143. Plaintiff realleges and incorporates by reference Paragraphs 1 through 142 of this Complaint as if fully set forth herein.

**The Legal Standard**

144. Under Ohio law, a defendant is liable for intentional infliction of emotional distress where the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community, the defendant intended to cause emotional distress or knew with substantial certainty that such distress would result, and the plaintiff suffered serious emotional distress as a direct result. *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 374–75 (1983). Ohio courts have recognized that conduct meeting this standard may arise from the abuse of a position of actual or apparent authority over another, particularly where that authority is wielded to inflict deliberate and sustained harm through the institutional power of government. The threshold for this claim is high, but this case presents the rare combination of facts that meets it.

**The Extreme and Outrageous Conduct**

145. Defendants' conduct was not a wrongful termination. It was a deliberate, multi-stage campaign of institutional destruction carried out by senior government officials holding positions of trust and authority, using fabricated evidence and the formal mechanisms of public employment law to permanently destroy a thirteen-year career and the professional identity of a person they knew to be innocent of the charge used to end it.

146. The extreme and outrageous character of Defendants' conduct is established by the following specific acts and circumstances, considered collectively:

a. **Pre-termination dismantling of professional standing.** Beginning on or about February 22, 2024, before any disciplinary charge had been formally issued, before any pre-disciplinary hearing had been held, and before any finding of misconduct had been made, Defendants stripped Plaintiff of her meaningful job duties, authority, and professional standing within the organization. Defendant Cole acknowledged under examination that the City cannot reduce an employee's roles or responsibilities before a pre-disciplinary hearing. Defendants did so anyway. Plaintiff was effectively treated and presented within the organization as a terminated employee while the false charge used to justify that treatment was simultaneously being constructed. This was not negligent administration. It was deliberate professional humiliation executed through the misuse of managerial authority before any lawful basis for it existed.

30

b. **Fabrication of the charge used to destroy her.** The charge of dishonesty, the sole substantive basis for Plaintiff's termination and the designation that permanently foreclosed her career, was built on a factual narrative Defendants knew, or recklessly disregarded, to be false. Plaintiff's voluntary February 22 email was characterized as a "confession" prompted by anticipated documentary exposure. At the time Cole offered that characterization under oath, he possessed the police report from which he acknowledged learning the children's names. That report was not released until February 23, 2024, the day after Plaintiff's email. Cole's contemporaneous response to that email, "We truly appreciate your follow-up and honesty," reflected his actual assessment at the time. The dishonesty characterization was constructed after the fact, by officials who knew the factual record, for the purpose of justifying a termination that the City's own progressive discipline policy did not authorize on the underlying conduct alone.

c. **Continued prosecution after proof of falsity was presented.** At the Civil Service Commission proceedings, Plaintiff's counsel presented Exhibit UU, documentary proof that the police report was not published until after Plaintiff had sent her email. Defendants were present for this presentation. They were confronted, in a formal public proceeding, with the evidence that their charge was built on a timeline that was objectively impossible. They continued to advance and defend the false timeline anyway. The decision to continue prosecuting a knowingly false charge after being confronted with documentary proof of its falsity, in formal proceedings before a governmental adjudicatory body, is not a discretionary judgment call. It is the deliberate choice to perpetuate irreversible professional harm after the opportunity to prevent it was presented and rejected.

d. **Permanent embedding of the false finding in a public record.** The result of Defendants' sustained prosecution of the false charge is not merely that Plaintiff lost her job. It is that an official finding of dishonesty, adopted by the Civil Service Commission in written Findings of Fact and Conclusions of Law, embedded in the formal public record of her employment, applied against a senior official described by the City itself as occupying a position "as high as it gets" within the Department of Public Safety, now permanently defines her professional identity in every future employment context in which her history is disclosed or discovered. Defendants did not merely terminate an employee. They permanently foreclosed a career through a false finding they manufactured and continued to defend after its falsity was proven.

e. **Selective application by the official who signed the termination.** Defendant Carlton signed, issued, and implemented the termination letter formally advancing the dishonesty charge against Plaintiff. The record before the Civil Service Commission includes a statement from Plaintiff's counsel, unrebutted in those proceedings, that Carlton herself

had made false statements to the City about a prior conviction and was not terminated, and was in fact promoted. The execution of a termination based on a dishonesty charge by an official who engaged in conduct the City characterized as dishonesty without consequence is not merely procedurally irregular. It is the kind of official conduct, the deliberate use of governmental power to impose a standard against one employee that is not applied to oneself, that compounds the outrageous character of the termination and distinguishes this case from ordinary employment disputes.

147. Taken together, these acts, the pre-hearing dismantling of professional standing, the fabrication of the charge, the continuation of its prosecution after documentary proof of falsity was presented, the permanent embedding of a false finding in a public record, and the selective application by an official who engaged in the same conduct without consequence, constitute conduct that goes beyond all possible bounds of decency tolerated in a civilized society and exceeds any legitimate exercise of governmental authority. *Yeager*, 6 Ohio St.3d at 375.

**Intent and Knowledge**

148. Each Defendant acted intentionally or with substantial certainty that severe emotional distress would result. Defendants were senior government officials with professional experience in disciplinary proceedings. They understood, or were substantially certain, that fabricating a dishonesty charge against a thirteen-year public servant, stripping her of her professional standing before any finding had been made, and embedding that false charge in a publicly accessible official record would cause severe and lasting emotional harm. The deliberateness of each act, particularly the continuation of the false charge's prosecution after documentary proof of its falsity was presented, establishes intentional or near-certain knowledge of the resulting harm.

149. Defendants' conduct was undertaken through a position of actual authority over Plaintiff's employment and career. The abuse of that authority, using the formal mechanisms of government employment law and the adjudicatory power of the Civil Service process as instruments of deliberate professional destruction, elevates the outrageous character of the conduct beyond what would be possible for a private actor without governmental authority.

**Causation and Damages**

150. As a direct and proximate result of Defendants' intentional or reckless conduct, Plaintiff suffered and continues to suffer severe emotional distress, including anxiety, depression, humiliation, loss of professional identity, emotional pain, and psychological harm associated with the destruction of a thirteen-year public service career through conduct Defendants knew to be dishonest in both fact and purpose.

32

151. Defendants are liable to Plaintiff for all compensatory damages resulting from their intentional or reckless infliction of emotional distress, including economic losses, non-economic damages, and all other damages according to proof.

## VI. DAMAGES

152. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer the following damages, which are ongoing and continue to accrue:

a. Back pay from April 12, 2024 through the date of judgment, representing lost wages at approximately $124,000 per year, together with the value of all employment benefits, health insurance, and other compensation Plaintiff would have received but for her unlawful termination;

b. Front pay representing the loss of future earnings and employment capacity for the period between judgment and the point at which Plaintiff can reasonably be expected to obtain comparable employment, in an amount to be determined by the jury;

c. Lost pension contributions and the reduction in Plaintiff's ultimate retirement benefit resulting from the interruption of more than thirteen years of continuous classified civil service employment at a critical career stage, in an amount to be determined;

d. Lasting and permanent reputational harm within the public safety, municipal government, and public administration employment community, including foreclosure from executive-level positions, resulting from the official dishonesty finding embedded in the public record of her employment;

e. Emotional distress, mental anguish, anxiety, depression, humiliation, loss of professional identity, and emotional pain associated with the destruction of a thirteen-year public service career through conduct Defendants knew to be built on a false factual foundation;

f. Out-of-pocket expenses incurred as a result of Defendants' conduct, including costs of administrative proceedings; and

g. Other economic and non-economic damages according to proof.

153. Plaintiff is entitled to recover compensatory damages in an amount to be determined by the jury for all injuries sustained as a result of Defendants' unlawful conduct.

154. Plaintiff is entitled to recover punitive damages against the individual Defendants in their individual capacities. Defendants' conduct was intentional, willful, and undertaken

with reckless disregard for Plaintiff's clearly established constitutional rights. Defendants knowingly fabricated material evidence, continued to advance a demonstrably false charge after being confronted with documentary proof of its falsity, and embedded that false charge in a permanent public record, conduct sufficiently egregious and reprehensible to warrant punitive damages in an amount sufficient to punish and deter such conduct.

155. Plaintiff is entitled to recover reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and other applicable law.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award the following relief:

A. Compensatory damages in an amount determined by the jury for all economic and non-economic injuries suffered as a result of Defendants' unlawful conduct, including but not limited to back pay, lost benefits, and reputational and emotional harm;

B. Back pay from April 12, 2024, through the date of judgment, representing lost wages at approximately $124,000 per year, together with all lost employment benefits, pension contributions, and other compensation, with appropriate pre-judgment interest;

C. Front pay representing loss of future earnings for the period beyond judgment during which Plaintiff's earning capacity remains impaired, in an amount to be determined by the jury;

D. Punitive damages against the individual Defendants in their individual capacities to punish and deter intentional, willful, and reckless disregard of clearly established constitutional rights;

E. Reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

F. A declaratory judgment that Defendants' actions violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983;

G. Equitable relief, including: (i) reinstatement to Plaintiff's classified civil service position with full restoration of seniority, benefits, and pension credit, or, in the alternative, a declaration that Plaintiff is entitled to front pay in lieu of reinstatement; (ii) correction or expungement of the false disciplinary records embedded in the public record of Plaintiff's employment; and (iii) provision of a constitutionally adequate name-clearing hearing based upon accurate facts and a fair evaluation of the verifiable record;

H. Pre-judgment and post-judgment interest as permitted by law; and

I. Such other and further relief as the Court deems just and proper.

34

**VIII. JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

*Sharece Miller-Curry*

Sharece Miller-Curry, #0090177

**Miller-Curry Law Office, LLC**

12600 Rockside Road Ste. 144

Garfield Heights, Ohio 44125

Phone: (216)926-2492

smclaw3@gmail.com

*Counsel for Plaintiff, Jakimah R. Dye*